INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL NO. 354, et al. v.
INDUSTRIAL COMMISSION OF UTAH.

No. 6361.  Decided December 2, 1941.  (119 P. 2d 243.)

See 39 C. J. Master & Servant, sec. 57; 31 Am. Jur. 884, 901.

*Paul E. Reimann,* of Salt Lake City, for plaintiffs.

*Grover A. Giles,* Atty. Gen., and *S. D. Huffaker,* Deputy Atty. Gen., for defendant.

*George S. Ballif,* of Provo, amicus curiae for CIO.

PRATT, Justice.

The International Union of Mine, Mill and Smelter Workers, Park City Local No. 99, an affiliate of the CIO, filed charges with the Labor Relations Board of this state (our Industrial Commission) charging the Utah Construction Company with unfair labor practices. Upon these charges and a preliminary investigation the Board issued a complaint against that company charging as follows:

"That on or about November 6, 1940, the said Respondent entered into a certain agreement purporting to control its labor relations on the Duchesne Tunnel of the Deer Creek project in the State of Utah, with International Union of Operating Engineers, Local No. 354; National Hod Carriers; Common Laborers Union, Local No. 79; and International Brotherhood of Electrical Workers, Local No. 354, all labor unions and affiliates of the American Federation of Labor, the said agreement to become effective November 12, 1940; that at the time said agreement was made and at the time it became effective the said signatory labor unions did not have, within the State of

Utah, in their combined membership a majority of all workmen employed on the said job and did not constitute the collective bargaining unit within the meaning of the said Utah Labor Relations Act, and this fact was well known to Respondent; that the said agreement was negotiated by said Respondent in secret and in collusion with the representatives of said unions and without the knowledge and consent of the majority of the workmen employed on said job at said times; and that said purported agreement, among other things, provides for a 'closed shop' and by it Respondent seeks to discriminate against a majority of the workmen employed on said job at the time it was made and became effective, and to compel them to become members of unions selected by said Respondent and not of their own choosing."

The matter was noticed for hearing and heard on February 8, 1941. The Board permitted the unions listed as affiliates in the quoted paragraphs to intervene. At the hearing all parties were present and represented by counsel. During the course of the hearing the Board member who heard the case limited the issue to that of whether or not on November 6, 1940, the union that signed the contract as bargaining agent was authorized to sign by a majority of members of the unions, affiliates of the AFL. He used such expressions as these:

"So the whole matter lies: What was the condition with reference to membership in AFL or CIO as of November 6; did either of you have a majority?

*      *      *

"The question we must determine: Did the American Federation of Labor affiliated unions have a majority, as you allege in your Complaint, as of November 6, 1940?"

The entire hearing was conducted upon this theory. A stipulation was entered into to the effect that the Board might make its own investigation of the records of the company and the AFL unions to ascertain that fact. As suggested by the Board member hearing the case, the stipulation was as follows:

"That the representatives of the American Federation of Labor will permit a representative of the Utah Labor Relations Board to check the list [of employees] as submitted by the Utah Construction Com-

pany as of November 6 against the books of the unions, with the understanding that the names will not be made a matter of record so that any particular employee may be identified."

After submission of the case to the Board for decision, and on February 21, 1941, the Board submitted to the parties its proposed findings of fact which it stated would be the bases of its decisions. The parties submitted briefs upon the matter, and on March 28, 1941, the Board rendered its decision, against the company, and issued a cease and desist order restraining the company from giving effect to the contract. In the findings of fact submitted February 21, 1941, the Board limited the case to the issue annuonced at the hearing; but in the final decision of March 28, it added that it could find no evidence to the effect that a majority of the employees (regardless of union affiliation) had authorized the union to act as bargaining agent. This was an issue upon which no hearing was had; upon which no evidence was submitted, unless it can be said that the stipulation authorized it.

After final decision intervenors applied for a rehearing, which the Board denied. The matter is now before us for review.

Among the objection raised by the intervenors is this:

"2.  The statute does not require that a majority of the employees be *members* of any union to authorize such union to act as bargaining agent."

The section of the law upon which this objection is based reads:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment; provided, that any individual employee or a group of employees shall have the right at any time to present grievances to their employer." Section 10, Chap. 55, Laws of Utah 1937.

We think the objection is well taken. The authorities clearly support the view that membership in a union is not a prerequisite to designating that union as bargaining agent. *Continental Oil Co.* v. *National Labor Relations Board*, 10 Cir., 113 F. 2d 473; *National Labor Relations Board* v. *Louisville Refining Co.*, 6 Cir., 102 F. 2d 678. There is nothing in the Section 8 of the Utah Labor Relations Act, which provides for self-organization and collective bargaining, which is in conflict with these decisions.

What then about the finding that a majority of the employees had not authorized the union to act as bargaining agent? Intervenors' objection to such a finding is covered by either of two of its objections, which read:

"3. The Board in obtaining access to the files and records of the AFL unions examined only part of the records and disregarded the remainder, both as to membership and authorizations signed by employees, so that in its findings and decision were erroneous and misleading."

"4. The Board had no sufficient competent evidence of any actual unfair labor practice to warrant any findings or decision or order adverse to plaintiffs."

As the parties to the proceeding, including the Board, tried the case solely upon the theory outlined above as being subject to intervenors' objection No. 2, above, it was improper for the Board to make its investigation upon any other theory without giving the intervenors an opportunity to meet that theory. When intervenors entered into the stipulation to the effect that the Board might make its own investigation, they had a right to rely upon the belief that the Board would conduct that investigation pursuant to the announced issue in the case. To permit the Board to leave that issue and investigate another would be to permit the Board to deprive intervenors and the company of a hearing. Although the complaint issued in the case has allegations which might be sufficient to support the finding that the majority of the employees had not

authorized the representation by the signatory union, no evidence was introduced upon that issue, nor was any attempt made to rely upon it. As to hearings, see Section 11 (b) of the Act.

Under the circumstances there was no evidence of any unfair labor practice on the part of the company. The Board's decision is without foundation. As this decides the case we shall not discuss other alleged errors.

The decision of the Board is vacated and set aside.

MOFFAT, C. J., and LARSON, J., concur.

WOLFE, Justice (concurring in part).

This proceeding was initiated by filing a complaint with the Utah Labor Relations Board charging the Utah Construction Co. with unfair labor practices as these are defined in Section 9, Subsections (1, 2 and 3), of Chapter 55, Session Laws of Utah 1937. A reading of the complaint discloses that the specifications of the charge bring the alleged unfair labor practice under Subsection 3. The specification is that the Utah Construction Company (1) signed a contract with certain named labor unions affiliated with the AFL when said unions did not have the majority of workmen employed belonging to the several unions, (2) negotiated in secret and collusion with the representatives of said unions, and (3) provided in the agreement for a "closed shop" in favor of said unions, thus seeking to *discriminate against the majority of workmen employed on the job at the time it was made and became effective and to compel them to become members of the union selected by the said respondent [Utah Construction Company] and not of their own choosing.*" (Italics added.) An examination of the specifications charged as unfair labor practices measured by Section 9, discloses that only the 3rd specification of the complaint, and especially that part in italics, sets out any of the practices designated by Section 9 as unfair practice. The language of Subsection (3), Section 9, covers such practice. Said subsection reads as follows:

"It shall be an unfair labor practice for an employer; (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; *provided*, that nothing in this act shall preclude an employer from making an agreement with a labor organization (not established, maintained or assisted by any action defined in this act as an unfair labor practice) to require as a condition of employment, membership therein, if such labor organization is the representative of the employees as provided in section 10, (a), in the appropriate collective bargaining unit covered by such agreement when made."

We do not understand that the signing of a contract with unions which do not have as members of the union a majority of workmen employed is denounced as an unfair labor practice if such union does not purport to represent all the men but only those who are its members or who authorized it. The question which is here presented is as to whether, at the time this contract was signed, i. e. November 6th, a majority of employees *then* on the work had authorized the AFL affiliates to represent them for bargaining purposes. We are not confronted with the question of whether the Construction Company could before it hired anyone, make a contract not to employ anyone who was not a member or who would not become a member of a particular labor union, especially where the signatory union was already existing and well recognized and in no sense organized as a subterfuge or for the purpose of circumventing rights recognized by Section 8, of Chapter 55.

What we understand to be asserted in this particular case by the CIO union is that where men are employed the employer cannot enter into a contract with a union to discriminate in regard to hire in favor of the signatory union or agree to require any terms or conditions of employment which will discourage nonmembership in any other but that union, unless the signatory union has authorization from a *majority* of the men employed if they constitute the appropriate unit for collective bargaining, constituting such union the bargaining agent; that the proviso in Subsection

(3) of Section 9, Chapter 55, permits such contract only if the signatory union is at the time of the contract the representative authorized by a majority of all employees of the unit appropriate for bargaining; that in the instant case such was not the case. The question as we shall see may ultimately revolve about what is an authorization and how may it be proved.

In order that my views may be understood in the light of the underlying facts of this case, I shall give a brief resume of those facts.

The Utah Construction Company, hereafter called respondent, is engaged in the business of construction. If it is the successful bidder for the construction of any project, it moves in with its executive force, and then may follow with a set of workers who erect the camps and mess halls, etc. These may consist, as in the instant case of carpenters and artisans, not so much needed for the later stages of work. After the preliminary work of clearing the overburden from the approach to the real tunnel, come the drillers, muckers, steel and cement men. In the instant case the very payrolls of the respondent show the change in the nature and number of types of artisans.

The work preliminary to driving the tunnel began about October 6, 1940. It was open-cut work, excavating for the approach to the tunnel. About December 30, 1940, the company began its work on the tunnel itself. The CIO testified that it was not particularly interested in the open-cut work because it considered such work to come under the jurisdiction of the AFL; that the time to organize on behalf of the CIO was when the tunnel men started on the job. Almost two years before, on June 16, 1938, there had been a meeting, attended by representatives of the CIO, Mr. Charles Dix representing the AFL District Council Hod Carriers, Mr. Bert Wilson, representing the International Union of Operating Engineers, Local No. 354, and L. F. Anderson representing the International Brotherhood of Electrical Workers, Local No. 353, in reference to jurisdiction

of the CIO and AFL on the construction of a dam and tunnel. The minutes of this meeting state "it was agreed, as we understand it, that the tunnel and mine work would be ceded jurisdictionally to the CIO and all other work to the American Federation of Labor." It was advanced by Mr. Rasmussen of the CIO that in this Duchesne contract no effort was made to bring the CIO into the situation until about December 13, 1940, when the tunnel workers began coming in because it was considered that the so-called gentleman's agreement of June 16, 1938, would pertain to the whole Deer Creek project.

The CIO held a meeting for the purpose of organizing all the employees working on the project on December 15th when it was resolved to disregard the AFL unions and to enroll members in the CIO. On December 16, 1940, 38 employees who were on the payroll of the respondent on November 6th had signed application blanks for the CIO.

There is no proof that the contract between the AFL Unions and respondent dated November 6, 1940, and effective November 12, 1940, was made in secret or was collusive. There was evidence that the company had entered contracts in other states with the AFL Unions; that the AFL Unions had agreements of long standing with certain employers and that workers of various skills and crafts, whether or not members of a union, traveling from one job to another following certain contractors who have considerable construction work, consulted with union officials for the purpose of causing them to start negotiations with the contractor; that this practice of negotiation before work was started was for the benefit of such workers who wanted jobs and desired to know the wage scale and conditions of work as well as for the benefit of the company; that such procedure was followed in this case and the contract of November 6th was the result; that it is quite necessary for the company to know in advance what wages they will be required to pay because the work is of comparatively short duration and if wage scales or working conditions satisfac-

tory to the employees were not established by negotiations prior to commencement of the work the job might be completed before the negotiations were completed. It was testified that the contract of November 6th was posted so that all employees might take notice on November 7th.

Under these circumstances it cannot be said that either the AFL Unions or the respondent entered into negotiations in bad faith or for any purpose of pre-empting the field or preventing any other union from representing the employees or that the closed shop was for the purpose of excluding CIO members from procuring jobs.

But the charge as above stated also sets out that respondent was guilty of an unfair labor practice in contracting with a union which did not represent a majority of the workers employed on November 6th to discriminate in favor of the members of that union. The theory is that if on November 6, 1940, a majority of all the employees in a unit appropriate for such purposes had selected the AFL unions, plaintiffs herein, to bargain for that unit, then under the provisions of subsection (3) of Section 9 the respondent was not guilty of an unfair labor practice; on the other hand that if on November 6th the above-named AFL unions were not the representative of a majority of all the employees in the appropriate unit, regardless of whether the members of that unit were actually members of the bargaining unions, the respondent was guilty of an unfair labor practice.

At the outset we are confronted with the question of what was the appropriate unit. From the facts as outlined above it is doubtful whether our "Little Wagner Act," so-called, was practically designed for construction companies whose work in one place is of comparatively short duration. This case illustrates the very difficulty of applying it. For the preliminary work, the carpenters, the steam shovel and drag line operators, machinists, etc., might constitute an appropriate unit for bargaining with the AFL unions to which they belong as their representative. Then the whole

complexion of the payroll changes. Along come the actual tunnel workers taking in drillers, muckers, etc., men who are in nature mine workers. These might constitute another appropriate bargaining unit. Yet the respondent must have some parties with which to contract. Perhaps it would have been well to try to divide the period bargaining with the two unions for the workers over different periods, if such procedure were practical. Otherwise, a contract may be made with one union which does represent at the time of the contract a majority of all the workers then employed and later the majority may consist of members of another labor group as is the case here. If the bargaining unit selects representatives who in fact at the time of the contract represent a majority of all the workers *in the unit*, any change to a majority of employees belonging to other labor unions in that unit, will not effect any change in the contract. Such later employees may be required to join the union which made the contract. If and when a new contract is made, the majority of employees may choose a new representative. It should be noted that we are not concerned with a situation where during the life of the contract which was legally made, a majority of workers decide to repudiate the union holding the contract and appoint another bargaining agency. We need not here concern ourselves with the question of how and under what circumstances a contract with a union acknowledged to be legally made can be terminated or repudiated either by the members of the union or by the employees constituting a unit.

In the instant case there seems not to have been any application to have the appropriate unit determined. The Board and all parties interested apparently have assumed that all the employees shall constitute a single unit for the duration of the whole work. Assuming then, for the purposes of this case, that the act applies to the respondent— and it certainly fits the definition of employer as contained in the act—the matter resolves itself into determining whether on November 6, 1940, the AFL signatory unions

represented a majority of all the workers then employed by respondent regardless of whether members of any union or not. If a majority was not so represented the respondent stands directed by Subsection (3) of Section 9, not to discriminate in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organizations. If a majority was not so represented the members of the CIO Unions may obtain employment without joining the AFL affiliate.

The Board did not *"limit* the issue" to that of whether on November 6, 1940, the union that signed the contract as bargaining agent was authorized to sign by a majority of members of the union affiliates of the AFL. The court is misled by the expressions cited as follows:

"So the whole matter lies: What was the condition with reference to membership in AFL or CIO as of November 6; did either of you have a majority?

\*     \*     \*

"The question we must determine: Did the American Federation of Labor affiliated unions have a majority, as you allege in your Complaint, as of November 6, 1940?"

What the examiner intended to do was to determine if either the AFL Unions or CIO Unions had a majority of all the employees on November 6th. If the AFL had a majority it would purportedly by that very fact be the bargaining agent. If it had not a majority but it represented a majority of all employees it would still be the bargaining agent. The examiner was obviously intending to determine the first matter first. That is why he stated the question as he did. That the scope of the inquiry involved the question first as to whether the AFL Unions had a majority of all the employees and if not, whether they were authorized by a majority to represent them, appears by the following:

"Commissioner Knerr: Instead of naming them, could you state approximately the number of men you had on that date? We appreciate you haven't got your records here, and you may not recall the names. Can you state approximately how many men were on the job

on the day the contract was signed? A. I couldn't, Mr. Commissioner, on that; it is something that I have had no reason to check. I never thought of it. I never gave it any thought."

"Commissioner Knerr: But you have records that will disclose that? A. I am confident, in my opinion, that we had a majority of at least all the union men on the job."

"Commissioner Knerr: In other words, you are sure you had a majority of all men on the job who belonged to the unions, but you are not sure whether you had a majority of all the employees? A. That's right."

After Mr. Dix had been handed a list of all the employees working for the company on November 6th, he stated he could recall that a number of names there appearing had been members of the AFL Unions but declined to state who, on the ground that to divulge the same would have opened the list to solicitation by the enemy. It was the desire to protect the AFL Union against this and its asserted inability to produce records of the members on November 6th who were employees of the company that led to the stipulation cited in the opinion. The stipulation can only be gathered by reading a number of pages of the transcript. It came out of the exchange of views among the parties. The so-called stipulation set out in the opinion was only a stipulation proposed by Mr. Knerr but the full extent of the inquiry which the parties agreed the Board might make is not limited to this passage set out in the opinion. The passage which the opinion quotes proposes that the Board may "check the list [of employees] as submitted by the Utah Construction Company as of November 6th against the books of the unions." But that was only one fact of the inquiry and was superseded by a more comprehensive stipulation.

The final stipulation was not crystallized but must be gathered from the discussion and exchange of views among the parties as contained in the record. A careful reading of the twenty pages of the record where endeavor was being made for agreement as to what facts the commission might investigate convinces us that the parties, after a running trialogue, did agree that the Commission might "check the

matter of employees of the AFL [against the company's payrolls] to ascertain the number [of employees belonging to said AFL] as to various dates" which the Board might think material, including the date where negotiations first started, the date when the contract was signed and the date when the contract was to and did become effective and that certain affidavits or statements submitted by the CIO could be considered only "in so far as they may be applicable and pertinent to the issues" and that the Board was authorized to make an investigation "of the facts of the matter" and base its decision on such facts and that the case could be submitted unless the Commission desired more evidence.

The agreement as to what facts the Board could investigate seems to me to be broad enough to permit the Board to make the full inquiry not only as to the number of employees belonging to the unions on October 3rd and November 6th but also as to whether a majority of the men employed on November 6th had ever authorized the AFL Unions to be their bargaining agent.

Concluding that the stipulation was broad enough to enable the Board to inquire into the broader question of whether a majority of the employees authorized the AFL affiliates as their bargaining agent regardless of whether members of the union, we come to the last question which requires us to determine whether the Board actually did make its investigation to determine this fact. That it considered it had done so is somewhat evidenced by its conclusion which reads in part:

"In accordance with the foregoing Findings we conclude that the Utah Construction Company, the respondent, in signing agreement with the International Union of Operating Engineers, Local No. 354; International Building & Hod Carriers Union, Local No. 79, and International Brotherhood of Electrical Workers, Local No. 354, failed to comply with the proviso of Section 9, subsection (3), Utah Labor Relations Act, Chapter 55, Session Laws of Utah, 1937, by reason of the fact that these said Unions had not been designated as the bargaining representative *by a majority of the said Respondent's Employees.*" (Italics added.)

It is not so clear from the findings whether the Board followed the narrower theory which, as the main opinion states, was wrong or whether it inquired into the broader question as stated above. Before discussing these findings it is well that we use our imaginations to envisage the task with which the Board was confronted. In construction work when negotiations begin between an employer and a union the work may not yet have been commenced and no eligible workmen may have been employed or on the job. At that time if there were any workmen engaged they may be members of the union which is negotiating. But day by day during negotiations the scene changes. Men are coming in. If up to November 6th the AFL affiliates had a majority of all employees working on the job it must be presumed without actual written or oral authorization of such members that the signatory unions represented them. If they did not have a majority of the employees as members they should have had a majority authorize the unions as their representatives. But if they had had such authorizations of a majority working, let us say on October 15th, by the 20th enough new workmen may have come in to change the set up. The witness for the AFL affiliates testified that some of the workmen were not enrolled as members because they could not pay their initiation fees until succeeding pay days but that they considered the signatory unions their representatives. The task of the Board, therefore, was one of determining not only what men on the payroll at the times between October 3rd and November 6th were members of the AFL affiliates (this being found would presumably have included them among those who had authorized) but also what other employees may have authorized the signatory unions to represent them. This, it may be assumed, could be determined in two ways—either by signed authorizations dated before November 6th or by oral testimony of men who stated they had verbally authorized these unions to represent them, or perhaps by filed applications for membership in the affiliated unions. Verbal testimony of an

officer of the union or other party that a certain number of employees had verbally authorized the signatory unions to represent them, if evidence of a verbal act and not hearsay, would at least require careful checking. Otherwise the fact of sufficient authorizations from men who had left the employment and could not be readily located might be established by the evidence of one man without corroboration. With these considerations in mind we now examine the findings.

"Under date of February 13, 1941, Harry McEwen, Investigator for the Utah Labor Relations Board, and Mr. William M. Knerr, Chairman of said Board, by virtue of stipulation between all interested parties, made an investigation to determine as to whether or not the local unions who signed the closed-shop contract with the Utah Construction Company had a majority of the employees either on October 3rd or November 6th, *who were members of the respective signatory unions, or authorized the signatory unions to act for and on their behalf.*" (Italics added.)

The Board evidently appreciated the real scope of its inquiry, although the introduction into the inquiry of two dates—October 3rd and November 6th—seems to confuse the issue. The inquiry should have been as to whether on the day the contract was made a majority of the employees *then* or a reasonable time before on the job had authorized the union to represent them. In order to know whether it was representing a majority of all the workers the union ordinarily would have to have that knowledge a short time *before* it signed the agreement. Therefore, proof of the fact that a majority of all the employees in a unit appropriate for collective bargaining may be made for a time not unreasonably too far ahead of the date of execution, the presumption, unless overturned, being that such majority continued.

The findings proceed to say:

We were unable to determine or find from the records of the International Union of Hod Carriers, Building and Common Laborers

Union, Local 79, Construction and General Laborers Union, any record on the books of members *or any individual authorization designating* or selecting said union to act for and on their behalf, as of October 3rd and November 6, 1940, employed on the Duchesne Tunnel Project." (Italics added.)

Here again the investigators recognized that a subject of inquiry was the number of individual authorizations supposedly independent of any union and found that they could find no record evidence of such authorization. October 3rd may be too far ahead of November 6th to indulge the presumption in a changing situation such as we have here that authorization from a majority of employees, if it existed, on the first date continued to exist on the second date.

The next paragraph of the findings reads:

"The Union officials submitted typewritten copies of names taken from authorization slips, receipt books, clearance cards and assignments. From these typewritten records we find that on October 3rd payroll, there were eight names which were claimed as members out of 23 eligible. However, those eight names do not appear on the union books or records as members either on October 3rd or November 6, 1940, or *that they had individually authorized the signatory unions to represent them prior to November 6, 1940.*" (Italics added.)

Because of the italicized portion it is not clear but that the Board may have considered it necessary for a member of the union to authorize in writing the union to act for it. It is not clear whether the pronoun "they" refers to eight men or the 23 eligible men. The Board, in all probability, by this finding intended to conclude that only eight men out of a possible 23 appeared on the record as union members and that even as to these eight, the records did not disclose that they were members of the union prior to November 6th or if not members, that they had authorized the union to represent them. But this raises the question of whether the records must show authorization. The statute does not require written authorization. We cannot assume that it must be in writing. We may assume until other-

wise advised that a member of a union in good standing ipso facto authorizes his union to bargain for him. Perhaps we may also treat an application for membership as equivalent to an authorization to represent unless it appears that the applicant or member belongs to a protesting union. In this instance however the Board found no authorizations nor as far as the findings show any application for membership on record nor did it find any record that the eight union members were such on or before November 6th. It is not clear that a failure to find authorization on record can be said to complete an investigation designed to uncover membership in a union or actual authorization. The investigation might, it is conceived, be pushed further to discover whether it was the custom to take written authorizations. If so and the custom was not followed the Board would not be unreasonable in concluding that there were no more authorizations than the record disclosed. But if oral authorizations are to be considered the Board might call for proof of them. Here it would, of course, be given considerable latitude in determining what evidence it would require to prove such oral authorizations. As before stated a mere statement of a union official that X, Y and Z, etc. had given authorizations to him orally to have the union represent them might be very unreliable and incapable of being checked. The Board might well conclude that it would not rest its conclusion alone on such evidence and the union which had not shown sufficient diligence in reducing the authorization to writing might not be heard to complain that the Board was arbitrary. In fact, it may not be beyond the powers of the Board to enact a rule of guidance to the effect that unless authorizations appeared on the records in the form of applications for membership actual memberships or written authorizations from employees who were not members or who had not applied, the Board would not, unless other evidence were easily obtainable, pursue the investigation further. Such a rule given general circulation among union circles might itself be conducive to the exercise of diligence

one might expect of labor unions to obtain and preserve in writing what ordinary diligence would dictate should be so preserved. But until that is done the findings should at least show whether the Board considered such possibility and whether it had inquired into the fact as to whether there might be oral authorizations and that it either found nothing which would lead it to think that there were such authorizations or that if there was something which intimated that there had been oral authorizations the evidence of the same was so difficult to obtain or so uncertain of fruitful results, or if obtained through the mouth of one who claimed to have received the authorizations, that the Board did not care to rest its decision on such testimony alone and that corroboration was impossible or so difficult to obtain as not to warrant the time and effort when results might be negligible. In other words, the findings should not only show what the Board found but the extent of its investigation and reasons for not pursuing it further. Otherwise this court, having no record of its acts done in pursuance of its investigatory powers, will not be in a position to pass on the question of whether its investigation was sufficient to support the findings even though the evidence, as far as it was obtained, did support the findings. Investigations conducted by an administrative agency must be as reasonably thorough as circumstances permit. Then in such case the Board could make affirmative findings that there were not sufficient authorizations which the court could review, rather than a negative finding that it had not been able to find from the record sufficient authorizations. Laws designed to serve a purpose must be reasonably construed so as not to defeat that purpose. We should not lay down as a matter of law a principle that the Board would have to indulge in endless investigation in a search for oral authorizations or in unprofitable and incommensurate effort in corroborating statements as to their existence. Nor should we lay down a principle that an uncontradicted statement of the existence of such alleged oral authorizations

must be believed by the Board. Such principles would open the door to fraud and take away from the Board part of its province of determining the credibility of testimony by interested witnesses uncorroborated. See *Norris* v. *Industrial Commission of Utah,* 90 Utah 256, 61 P. 2d 413.

But in the instant case we have nothing in the findings to show how far the Board went in its investigation along the path of determining whether there were authorizations outside of the records it examined, and, if it made no investigation beyond the records, why it did not do so. When findings are based on investigations not recorded at a hearing, sufficient detail as to the full nature and extent of the investigation should be included in the findings as well as the results of the investigation.

The fact that the Board states that eight names on the October 3rd payroll were claimed as members out of 23 eligible but the names do not appear on the record of the Local 79 on October 3rd or November 6th lends countenance to the contention that it may have confined its inquiry as to employees who were members or to employees in regard to whom there were record authorizations. However, as before stated this may have been a fact found as to only a part of the inquiry. The Board seems to have been looking for authorization regardless of union membership but makes no finding as to whether it found authorization from any of the 23 employees outside of the eight who it was claimed were members. We think inquiry should have been directed to the fact as to whether on November 6th or a reasonably short time theretofore a majority of the employees then employed had authorized representation. If during *any* time between October 3rd and November 6th there were authorizations not cancelled or withdrawn and/or memberships or applications for membership not withdrawn in the signatory union, it might suffice to show that the signatory unions were authorized bargaining agents of such employees on November 6th, on the presumption that the authori-

zations continued until it was shown that they were withdrawn.

The Board finds in the next paragraph that according to typewritten lists submitted, Local 79 had a majority of all the employees as members subsequent to November 6th. The finding ends with the sentence

"but none of these names are a matter of record on the books of the Union as of October 3 or November 6, 1940, or that they had individually prior to November 6, 1940, authorized said union to act for and on their behalf."

This is a definite finding that the records show no authorization regardles of union affiliation.

In the next paragraph it is stated that 81 individuals signed authorizations to have Local 79 represent them in negotiations but all were dated in the latter part of December, 1940, or in January of 1941. We find it stated at the end of the paragraph

"we do not find any of these members who signed these authorization clearance slips on the books of the union as of October 3rd, or November 6th, 1940."

This sentence seems to give support to the contention that the Board though it necessary that the employees should be members of the union.

In the next paragraph it is stated:

"There are also in possession of the Utah Construction Company several check-off slip assignments signed by the employees who claim to be members of the International Hod Carriers, Building and Common Laborers Union, Local 79, but we were unable to determine or find any documentary evidence that they were members of said local union as of October 3rd or November 6th, 1940. It is stated by the representatives of the local union that the reason the members are not on the books as of October 3rd or November 6th, 1940, although they were employed prior to November 6th, 1940, it is alleged, was because their names would not appear on the books of the union until they made their first payment of either the initiation fee or dues."

This lends countenance to the contention that the Board confined its investigation in this instance to actual memberships or record authorizations without giving any adequate reason for not going further.

The last sentence of the next paragraph:

"Therefore, we are unable to determine as a matter of fact from the records of this union that there were any members of operating Engineer Local 354 on the job either as of October 3rd, or November 6, 1940, or that the employees had individually, prior to November 6, 1940, authorized the said union to act for and on their behalf."

Here the Board seems to sense that there might be authorization to have the union act for employees who were not members.

The next paragraph reads as follows:

"The books or minutes of the union or any written instrument or individually signed document fail to show that the signatory unions, or any other union, had a majority of its members working on the project either on October 3rd or November 6, 1940, or that they had authorized the signatory unions to represent them as their collective bargaining agents. We found no record of any meeting of the employees on the job prior to October 3rd or November 6, 1940, for the purpose of choosing any of the signatory unions as their collective bargaining agent. The first payroll and pay day was as of October 3rd, 1940, on this project."

This paragraph also lends support to the theory that the Board considered that not only must the majority of employees be members of the signatory unions but their own unchallenged membership must individually or by meeting authorize the union to be their bargaining agent.

Having examined these findings in detail, we think that it may be doubtful whether the Board narrowed its inquiry to the question of whether the majority of employees were members of the signatory unions, or based its findings on the larger question of whether a majority of employees as they existed as of November 6th or a reasonable time prev-

ious thereto, had on or before November 6th authorized the signatory unions to act for them. Furthermore, the findings do not show the nature and extent of the investigation dehors the record or any reasons for not going beyond the record. Being in doubt we think the order of the Utah Labor Relations Board must be set aside, but only for the purpose of permitting the Board to make further investigation according to the stipulation into the question of authorizations regardless of union membership as suggested herein. It may of course hold hearings as part of said investigation. Since under Section 11, Subsection (f), of the Act, we have power to modify an order, we have power to set aside for a specific purpose. I think it need be set aside only for the particular determination of the matters herein mentioned and for findings in reference thereto under such procedure. If the Board so desires the evidence already given may stand and the matter considered only for the investigation of the particular matter above mentioned in reference to which we find the Findings in doubt. Under such order the Board should be free to investigate the particular matters herein mentioned only, or reopen the whole case as in its discretion it may deem advisable. With these modifications I concur in the order of this court that the order of the Board be set aside.

McDONOUGH, Justice (concurring).

I concur in the order setting aside the order of the Board. However, for the reasons stated in the opinion of Mr. Justice WOLFE, I am of the opinion that the Board's order should be set aside for the purpose stated in such opinion.